The Memorandum Decision and Order below is hereby
signed.  Dated: April 30, 2008.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge


UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| NETtel CORPORATION, INC., *et al.*, | ) | Case No. 00-01771 |
| | ) | (Chapter 7) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| NORTEL NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 05-10077 |
| WENDELL W. WEBSTER, Trustee, | ) | |
| | ) | Not for Publication in |
| Defendant. | ) | West's Bankruptcy Reporter |

MEMORANDUM DECISION AND ORDER RE
NORTEL NETWORKS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NETtel Corporation, Inc., as debtor, commenced a case under
chapter 11 of the Bankruptcy Code (11 U.S.C.) by filing a
voluntary petition.[1]  The debtor's principal prepetition secured
lenders were Nortel Networks, Inc., Allied Capital Corporation,

_____

[1]  The debtor's case has been jointly administered for
purposes of the clerk's docket with the case of another debtor of
no relevance here.

and Williams Communications, Inc. ("the Lenders").  During the
pendency of the case as a chapter 11 case (the "Chapter 11
Period"), the debtor served as a debtor in possession under 11
U.S.C. § 1101 entitled to exercise the powers specified by 11
U.S.C. § 1107.  In that capacity, it was authorized to use the
Lenders' cash collateral pursuant to the terms of an interim cash
collateral order ("Interim Order"), which included  a provision
for replacement liens for any diminishment of the cash collateral
as a means of adequate protection.  Upon the conversion of the
case to one under chapter 7 of the Bankruptcy Code, the debtor
ceased to be a debtor in possession.  Wendell W. Webster was
appointed trustee in the chapter 7 case.

Serving as the administrative agent for the Lenders
(including itself), Nortel, as plaintiff in this adversary
proceeding, seeks a judgment determining and declaring the extent
to which it has replacement liens on proceeds of preference
action recoveries (the "Preference Action Proceeds") that Webster
has made under sections 547 and 550 of the Bankruptcy Code (11
U.S.C.).  Nortel contends in its complaint that the debtor and
Webster diminished the value of the Lenders' cash collateral
postpetition by an amount substantially in excess of $2.9 million
and, pursuant to the terms of the Interim Order entered into
during the Chapter 11 Period, the Lenders were granted a
replacement lien of equal amount in the Preference Action

2

Proceeds.  Nortel has filed a motion for partial summary judgment
limited to depletion of the Lenders' cash collateral during the
Chapter 11 Period, contending that there are no disputed issues
of material fact as to at least $2,593,572.83 of the Lenders'
asserted replacement lien, and that the Lenders are therefore
entitled to immediate disbursement of those funds from Webster.

Webster opposes Nortel's motion, making two principal
arguments, first, that the Lenders cannot trace the deposits made
into the debtor's deposit accounts during the Chapter 11 Period
to the Lenders' prepetition collateral because the debtor failed
to segregate the Lenders' cash collateral from other estate funds
(including proceeds of postpetition accounts receivable), and,
second, that the Lenders' claim to a replacement lien for the
partial depletion of the debtor's deposit accounts must fail
because the Lenders failed prepetition to take the proper steps
to perfect their security interest in the debtor's deposit
accounts.

I

BASIC FACTS

The material facts, which are largely undisputed, are as
follows.

The debtor, NETtel Corporation, Inc., filed a voluntary
petition under Chapter 11 of the Bankruptcy Code on September 28,
2000.  On October 23, 2000, the case was converted to a case

3

under Chapter 7 of the Bankruptcy Code.  The debtor operated as debtor in possession for 25 days under chapter 11.  On October 24, 2000, Webster was appointed as chapter 7 trustee of the debtor's bankruptcy estate.

Nortel Networks, Inc. is a prepetition secured lender of the debtor and is the administrative agent for itself and Allied Capital Corporation and Williams Communications, Inc., also prepetition secured lenders of the debtor.  Pursuant to a prepetition credit agreement, the debtor purported to grant the Lenders a security interest in substantially all of the debtor's prepetition assets, including:

> a. All Capital Stock of each of the subsidiaries of the Debtor;
>
> b. All Property of the Debtor, as more particularly defined in the Security Documents, including without limitation: accounts; chattel paper; instruments; general intangibles; documents; contract rights; equipment; inventory; intellectual property; licenses; investment property; deposit accounts; customer deposits; brokerage accounts; Pledged Shares; indebtedness owed to Debtor; real property; other goods and personal property of any kind or character, whether tangible or intangible; and
>
> c. All cash and non-cash proceeds and products of any and all of the foregoing.

As of the petition date, the debtor's aggregate outstanding

indebtedness to the Lenders was approximately $92 million.[2]  The

Credit Agreement between the Lenders and the debtor reflects the

grant of a security interest in substantially all of the debtor's

prepetition assets.

On October 18, 2000, before the debtor's case was converted

from a case under chapter 11 to a case under chapter 7 of the

Bankruptcy Code, the court approved the Interim Order (entitled

Interim Agreement and Consent Order Authorizing the Debtor's Use

of the Lenders' Cash Collateral on Certain Terms and Conditions).

As adequate protection to the Lenders, the Interim Order provided

in pertinent part in decretal paragraph 5 that:

> the Court hereby grants to Nortel Networks as
> Administrative Agent for the benefit of itself and the
> Lenders a valid and perfected first priority lien on
> and security interest in, any and all of the Debtor's
> rights, title and interests in and to all of its goods,
> property and interests in property . . . whether
> acquired or obtained before or after the Petition Date
> . . .,*[FN 1], including without limitation interests
> in and recoveries realized from all actions brought by
> the Debtor or its predecessors or successors in
> interest pursuant to Sections 542, 543, 544, 545, 547,
> 548, 549, 550 and 553(b) of the Bankruptcy Code (the
> "Postpetition Collateral").  Nortel Networks' (as
> Administrative Agent for the benefit of itself and the
> Lenders) liens and security interests in the

---

[2]  In his statement of material facts in genuine dispute,
Webster emphasizes that the $92 million figure is an
approximation and that Nortel has never made a showing of the
exact amount of its lien.  He also concedes that he has no
evidence to the contrary.  Because the $92 million figure is
consistent with the unchallenged proofs of claims filed by the
Lenders in this case, and because the asserted replacement lien
is a mere fraction of that amount, it is unnecessary at this
juncture for the Lenders to be more precise.

> Postpetition Collateral . . . shall not be subject or
> subordinate to any lien or security interest that is
> avoided and preserved for the benefit of the Debtor
> pursuant to Section 551 of the Bankruptcy Code.
>
> FN 1: *but only to the extent that Nortel as
> administrative agent for itself and the Lenders' pre-
> petition liens are (a) valid and perfected pre-petition
> liens and security interests or (b) to the extent
> Debtor's use of Lenders' Collateral or Cash Collateral
> are not fully replaced with postpetition assets of
> equal value.

Nortel concedes that part (b) of the footnote is a limitation on

the Lenders' right to a lien on the proceeds of the preference

actions, but contends as to part (a) of the footnote that the

Lenders' liens are now deemed to have been perfected prepetition

pursuant to the terms of the Interim Order regarding the time for

raising objections to the perfected status of the liens.  In

pertinent part, the Interim Order provided, first, in recital

paragraph 6, that:

> Subject to the terms of paragraph eighteen (18) below
> (entitled "Limited Period for Objections to Liens and
> Claims"), the Debtor acknowledges, reaffirms and
> stipulates to the Pre-petition Indebtedness owed by the
> Debtor to Lenders and to the validity, perfection,
> priority, and extent of certain security interests and
> liens securing such Pre-petition Indebtedness (defined
> below) in favor of Nortel Networks as Administrative
> Agent for its benefit and the benefit of the Lenders on
> the Pre-petition Collateral (defined below), in each
> case pursuant to the written agreements, documents and
> instruments described below [describing agreements].

Second, in recital paragraph 10, the Interim Order provided in

relevant part:

> Subject to the terms of paragraph eighteen (18) below .
> . . [the Lenders'] liens and security interests in, to

6

> and against all of the Pre-petition Collateral are
> valid, enforceable and properly perfected . . . .

Finally, in recital paragraph 9, the debtor and Nortel stipulated

that the Lenders had perfected their security interests in and

liens on the Pre-petition Collateral.

Decretal paragraph 18, however, provided a procedure for

objecting to the Lenders' asserted liens: parties were to have a

"Review Period" ending on "the later of the date this Order

becomes a Final Order or sixty (60) days from the date this Order

is entered," and if no filing was made during the Review Period

to raise a contest, all parties would be forever barred from

contesting the validity, perfection, priority and enforceability

of the Lenders' liens and security interests.  This provision

overrides any stipulation in the recital paragraphs of the

Interim Order regarding the perfection of the lenders' liens and

security interests.

Because the Interim Order was never made a final order, the

Review Period has never expired, and thus Webster has timely

raised his contention that the Lenders' liens and security

interests were not perfected in the debtor's deposit accounts.

At the hearing on the Interim Order on October 13, 2000, the

court struck language in the proposed interim order providing

that if no timely objection was made to the interim order, the

interim order was to be deemed a final order without further

order.  The court made clear at the hearing that the Interim

Order was to become a final order only via the entry of a new
order as a final order, and the language of the Interim Order as
entered plainly so provided.  At the October 12, 2000, hearing,
Nortel's counsel agreed to re-submit an order captioning it as a
final order.  Through apparent inadvertence, no proposed Final
Order was ever submitted by the Lenders, as the docket does not
reflect the submission of such a proposed order.

     Notice of the hearing on the motion for use of cash
collateral gave notice of the emergency hearing but no notice of
the deadline for filing objections to the motion.  The Interim
Order provided (at decretal paragraph 21) that objections to
entry of a final order must be filed within 15 days of service of
the Interim Order.  The court will assume, without deciding, that
the Lenders or the debtor gave notice of the final hearing as
required by Rule 4001(b)(3), and that the notice included notice
of the deadline for objections set forth in the Interim Order, as
that assumption gains the Lenders nothing for reasons explored

below.[3]  The Interim Order then provided (at decretal paragraph
22) that a final hearing would be held on October 31, 2000, in
the event a timely objection was filed, and that if no timely
objection was made "to the entry of this Interim Order as a Final
Order, the Court will enter the Interim Order as a Final Order
without further proceedings or order of this Court."

Teng Construction, L.L.C. and Teng & Associates, Inc.
(collectively "Teng") filed the only objection to the entry of a
final cash collateral order.  Nortel and Teng entered into a
stipulation (DE No. 96), pursuant to which Teng agreed to
withdraw its objection "so that the [Interim Order] can become

---

[3]  In drafting this provision, the debtor and the Lenders
may have had in mind the 15-day period after service of a motion
to use cash collateral that is the earliest date for setting a
final hearing on the motion.  See F.R. Bankr. P. 4001(b)(2).
But instead of tying the deadline to that 15-day period, they
drafted the proposed Interim Order to give parties 15 days after
service of the Interim Order to file objections.  There is no
indication that the debtor or the Lenders served the Interim
Order (as entered on October 18, 2000) on any of the entities
entitled to notice of the deadline under Fed. R. Bankr. P.
4001(d)(2) or of its terms.  But I will assume (without deciding)
that they did, as at least one creditor responded with an
objection.  Assuming that such service was made, the precise
deadline for objections to the entry of a final order could be no
earlier than 15 days after the clerk entered the Interim Order on
October 18, 2000, thus making objections due no earlier than
sometime in November 2000.

final."[4]  The stipulation with Teng reinforced that the provision

of adequate protection to the Lenders was only to the extent that

they had perfected liens or security interests, as the

stipulation provided that the replacement liens "shall only be to

the extent that [the Lenders] had valid and perfected pre-

petition liens and security interests . . . ."  Because of the

stipulation, no final hearing was held.  By the time of the

scheduled final hearing, the case had already been converted to

chapter 7, thus terminating the debtor's debtor in possession

status and mooting the necessity for the entry of a final order

continuing the debtor's authorization to use cash collateral past

the date of the scheduled final hearing.

But the lack of the necessity of a final hearing to entitle

the Lenders to have the Interim Order become a final order via

entry of a final order, and the lack of any needed authorization,

via a final order, to use cash collateral beyond October 31,

2000, did not trigger the commencement of the Review Period for

---

[4]  The date stamp on the Teng stipulation indicates that it
was filed in "open court" on October 31, 2000.  The court,
however, has no further record of a hearing having actually been
held on that date.  The most likely explanation for this apparent
contradiction in the record is that one or more parties appeared
for the October 31, 2000 hearing, and in lieu of going forward
with the proceedings, submitted to the courtroom deputy the
stipulation.  At that juncture, I can only speculate that the
courtroom deputy inadvertently used the "filed in open-court"
stamp rather than the conventional "filed" stamp notwithstanding
a determination by the parties that the stipulation obviated the
need to go forward with the hearing.

challenging the perfection of the Lenders' liens and security
interests.  Only the entry of a final order would have commenced
the Review Period.[5]  The Lenders never requested the court to
enter a final order.  Thus, no final order was entered to make
clear on the record that the Interim Order was now entered as a
final order, thus commencing the Review Period.

Although the case was ultimately converted to a case under
chapter 7 on October 23, 2000, the Interim Order provided at
decretal paragraph 15 that conversion of the case was not to
affect the rights of the Lenders under the Interim Order.  It
further provided at decretal paragraph 10 that the Interim Order
would be binding on any chapter 7 trustee in a converted case.
The Interim Order provided at decretal paragraph 2 that the
authorization granted to the debtor under the Interim Order would
expire upon the earlier of October 31, 2000, the entry of a final
order authorizing the use of cash collateral, or certain other

---

[5]  The stipulation with Teng (at paragraph 1) provided in
relevant part that:

> Any lien or security interest granted to Nortel . . .
> with respect to the Debtor's use of cash collateral
> shall only be to the extent that . . . the Lenders had
> valid and perfected pre-petition liens and security
> interests . . . .

This language contemplated that the entry of the Interim Order as
a final order, alone, would not result in a determination that
the Lenders' prepetition liens and security interests were
perfected: it would only trigger the commencement of the Review
Period.

events of no relevance here, and, significantly, provided that
the Lenders' rights under the Interim Order "with respect to all
transactions which occurred prior to the occurrence of any
termination," including replacement liens granted to the Lenders
as adequate protection, would survive the termination of the
Interim Order.

Webster has reduced the preference claims to judgments or
settlements totaling over $4.8 million thus far.  Webster is
holding in escrow Preference Action Proceeds in the amount of
$3,569,102.68 as of October 10, 2006, which represents the
balance after disbursement of the trustee's allowed fees and
expenses incurred to recover such amounts.  If the court
determines that the Interim Order is binding, the Lenders have a
lien on the Preference Action Proceeds (1) to the extent the
Lenders' prepetition liens are valid and perfected prepetition
liens and security interests, and (2) to the extent of the
depletion of the Lenders' cash collateral during the Chapter 11
Period, but only to the extent that such collateral or cash
collateral were not fully replaced with postpetition assets of
equal value.

As of the petition date, the debtor maintained six deposit
accounts, including a Lockbox Account at Bank of America, account
number 001914234110 (the "Lockbox Account").  On the petition
date, the total on deposit in the debtor's deposit accounts was

$1,973,344.26.  During the Chapter 11 Period, deposits in the amount of $2,237,713.90 were made into the Lockbox Account. There is no direct documentary evidence reflecting whether any specific deposits made into the Lockbox Account during the Chapter 11 Period were made on account of prepetition accounts receivable, or if they instead related to postpetition accounts receivable or other postpetition assets.

The Lockbox Account was the predominant means by which the debtor received its sales revenues, that is, customer payments for the sale of services provided by the debtor.  Nortel points to two items that it contends constitute depleted cash collateral:

- First, the deposits remaining in the deposit accounts as of the Petition Date constituted the Lenders' cash collateral, and stood at $1,973,344.26.[6]

- Second, during the Chapter 11 Period, the debtor deposited $2,237,713.90 into the Lockbox Account, and Nortel contends that these deposits were proceeds of prepetition accounts receivable constituting its cash collateral.

These two items total $4,211,058.16. As of the date of the conversion of the case to chapter 7, the total balance in all of

---

[6]  Webster's concession that the deposit accounts were the Lenders' cash collateral is not a concession that the Lenders' security interest in the cash collateral was perfected.

13

the debtor's deposit accounts was $1,617,485.33.  Nortel thus
contends that its cash collateral was depleted by the end of the
Chapter 11 period in the amount of $2,593,572.83.

## II

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, assuming all reasonable
inferences favorable to the nonmoving party, there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v.
Liberty Lobby, Inc., 477 U.S. 242 (1986).  The court will not
grant summary judgment "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."  Liberty
Lobby, 477 U.S. at 248; Doe v. U.S. Postal Service, 317 F.3d 339,
342 (D.C. Cir. 2003).  Although a finder of fact at trial is
permitted to draw inferences from the evidence, those inferences
"must be reasonably probable, and based on more than
speculation."  Rogers Corp. v. EPA, 275 F.3d 1096, 1104 (D.C.
Cir. 2002) (internal quotations and citations omitted).  When the
evidence allows for contradictory inferences, summary judgment is
inappropriate.  Id., citing Londrigan v. FBI, 670 F.2d 1164, 1171
n. 37 (D.C. Cir. 1981).

The moving party bears the burden to show that the material
facts are undisputed, see Celotex, 477 U.S. at 322.  The

14

nonmoving party, however, may not rest on mere allegations or
denials, but must instead demonstrate the existence of specific
facts that create a genuine issue for trial.  See Liberty Lobby,
477 U.S. at 256.

III

WEBSTER IS BOUND BY THE INTERIM ORDER

Webster argues that because the Interim Order was never
entered as a final order as contemplated under the Interim Order,
and because the case was converted to a case under chapter 7
before the time to object to the Interim Order expired, the order
is not binding on him.  The court rejects this argument.

The Interim Order was approved by the court on an emergency
basis and on only two-days notice to parties in interest, as
permitted under Fed. R. Bankr. P. 4001(b)(2).[7]  Webster has not
challenged the propriety of the court's entering that order, and
the time for anyone to appeal the Interim Order expired long

---

[7]  Specifically, Rule 4001(b)(2) provides:

Hearing. The court may commence a final hearing on a
motion for authorization to use cash collateral no
earlier than 15 days after service of the motion.  If
the motion so requests, the court may conduct a
preliminary hearing before such 15 day period expires,
but the court may authorize the use of only that amount
of cash collateral as is necessary to avoid immediate
and irreparable harm to the estate pending a final
hearing.

ago.[8]

The court, in granting a motion for use of cash collateral
on an emergency basis under Rule 4001(b)(2), is required by 11
U.S.C. § 363(e) to condition the use of cash collateral as is
necessary to provide the secured party adequate protection.  Rule
4001(b)(2) contemplates that the court can grant authorization to
utilize cash collateral on an emergency basis (and necessarily
with provisions for adequate protection of the secured party's
interests), but only to the extent necessary to avoid immediate
and irreparable harm.  Although such an emergency interim order
issues under Rule 4001(b)(2) only as a result of a "preliminary
hearing," it is a final order for purposes of the limited rights
it confers with respect to the use of cash collateral in the

---

[8]   The motion leading to the Interim Order was a consensual
motion to approve the parties' agreement relating to the use of
cash collateral and for provision of adequate protection, a type
of motion governed by Fed. R. Bankr. P. 4001(d)(2).  No one ever
contended that the procedures of Rule 4001(d)(2) were not
followed in entering the Interim Order.  That rule makes no
express provision for granting such motions on an emergency
interim basis pending a final hearing.  However, pursuant to Fed.
R. Bankr. P. 9006(c), the court could shorten the deadlines set
forth in that rule for objections and a hearing and accomplish
the entry of an order on an emergency basis pending a further
hearing, and, as occurred here, to protect the interests of the
creditor body, any such order should be subject to the
restrictions of Rule 4001(b)(2) regarding limiting use of cash
collateral to that which is "necessary to avoid immediate and
irreparable harm to the estate" until a final hearing, to be set
"no earlier than 15 days after service of the motion."  But this
is all academic because no one ever challenged the propriety of
entering the Interim Order under the procedures of Rule
4001(b)(2), and no one filed a timely appeal from the Interim
Order.

interim pending a final hearing at which the "immediate and irreparable harm" limitation no longer applies.  Rule 4001(b)(2) contemplates that a final hearing to authorize the prospective use of cash collateral beyond the amount required to avoid immediate and irreparable harm can be held no earlier than 15 days after service of the motion to use cash collateral, but that does not make the interim order entered at a preliminary hearing a non-final order.  The purpose of a final hearing under Rule 4001(b)(2) is not to make the interim order a final, appealable order, as the interim order is already such an order.  Instead, the purpose of a final hearing is to obtain authorization for the use of cash collateral beyond that use that was required to be authorized on an emergency basis as necessary to avoid immediate and irreparable harm.

Here, the Interim Order made clear in decretal paragraph 2 that the adequate protection rights afforded the Lenders with respect to the transactions that occurred prior to the debtor's authorization under the Interim Order terminating (as occurred here on October 31, 2000), were to survive the termination of such authorization, and that the provisions were to be binding on all creditors, including any chapter 7 trustee.  Although decretal paragraph 21 of the Interim Order provided a deadline for parties to object to the Interim Order, that related to objecting to the Interim Order to prevent its becoming a final

order, after opportunity for a final hearing, that would resolve

all issues relating to the motion to use cash collateral (without

regard to the limitation of use of cash collateral before a final

hearing to those expenditures required to avoid immediate and

irreparable harm).[9]

That the Interim Order was to be a final and binding order

was made clear by a provision that allowed a creditor's committee

to revisit at the final hearing a provision regarding such a

committee's not having any right to surcharge the cash

collateral.  No other provision of the Interim Order allowed the

protections it accorded the Lenders to be revisited as a result

of the right to object to the entry of a further order.

The conversion of the case from a case under chapter 11 to a

case under chapter 7 did not render the terms of the Interim

Order moot or ineffective.[10]  Although the conversion of the case

stripped the debtor of the right to control estate assets on a

forward going basis, during the Chapter 11 Period the debtor used

the Lenders' cash collateral to operate its business, and the

---

[9]  For example, had a final order been entered that
incorporated the budget attached to the Interim Order, it would
have authorized the use of cash collateral (on certain terms)
into December 2000, well past the final hearing date of October
31, 2000.

[10]  An undisputed consequence of no subsequent cash
collateral order having been entered is that the Interim Order's
self-imposed expiration date of October 31, 2000, was effective,
and the debtor's conditional authorization to use the Lenders'
cash collateral was not extended beyond such date.

18

Lenders were entitled to adequate protection for that use.

As of October 31, 2000, the same date on which the Lenders filed a motion for relief from stay rather than consenting to the prospective use of their cash collateral by the debtor (which would have been meaningless in light of the appointment of a chapter 7 trustee), parties in interest were on notice that the Interim Order would stand as the final word of the court as to the terms under which the debtor was permitted to use the Lenders' cash collateral, and which permission necessarily terminated and could not be extended beyond the conversion of the case to a case under chapter 7.  In short, notwithstanding that it was styled as an "interim" order, the Interim Order was a final order in that it "fixed rights and determined liens for a discrete period of time . . . . [and neither] [t]his court nor the parties [ever] had any intention to revisit the rights and liens granted by the [Interim Order]."  In re Tek-Aids Indus., Inc., 145 B.R. 253, 258 n. 5 (Bankr. N.D. Ill. 1992).

The Lenders relied upon the terms of the Interim Order in permitting the debtor's use of the Lenders' cash collateral during the Chapter 11 Period.  Had the debtor sought leave to use cash collateral over the Lenders' objection, the court would have conditioned such use on the provision of adequate protection, which would have included a term providing for a replacement lien to the extent that cash collateral upon which the Lenders held

19

valid and perfected liens was diminished by the debtor's use of

cash collateral.  The Lenders ought not be worse off because they

endeavored to arrive at mutually acceptable terms for use of

their cash collateral, terms that parties in interest could have,

but did not, oppose.

IV

THE LENDERS ARE NOT REQUIRED TO
REDUCE THE AMOUNT OF THEIR REPLACEMENT
LIENS BY THE EXPENSES INCURRED DURING THE CHAPTER 11 PERIOD

Webster further contends that the value of the Lenders'

replacement lien must take into account the expenses incurred by

the debtor in chapter 11 to derive the net diminution in the

value of the Lenders' cash collateral.  The Interim Order

provided in decretal paragraph 8 that administrative claims in

the case would not be entitled to priority over the claims of the

Lenders, and that no such claims would be imposed against "the

Pre-petition Collateral or the Postpetition Collateral," with the

caveat that:

> notwithstanding the existence of such liens and
> superpriority treatment set forth in this Interim
> Order, . . . the Lenders shall permit the proceeds of
> the Postpetition Collateral to be used (but only in the
> event and only to the extent that unencumbered property
> of the Debtor's estate is insufficient to satisfy the
> following expenses) (a) to pay professional fees of the
> Debtor in amounts as may be approved after notice and
> hearing by the Court, provided such fees are (1) not in
> excess of the amounts provided in the Budget; and (2)
> approved by the Court; and (b) to pay claims for the
> statutory fees of the United States Trustee.

This language did not alter the Lenders' right to a replacement

20

lien, and only authorized the Postpetition Collateral subject to
that replacement lien to be used to pay the two specified
administrative claims if insufficient unencumbered assets were
available to pay such claims.  If Nortel's motion were granted,
Webster would still hold sufficient Preference Action Proceeds to
pay the two specified administrative claims. Accordingly, I
reject Webster's argument that the Lenders must show the amount
of expenses incurred during the Chapter 11 Period.  Such expenses
as payment of the debtor's employees' postpetition wages are not
an appropriate deduction in measuring the extent of the Lenders'
replacement lien.

V

WEBSTER IS ENTITLED TO CHALLENGE
THE PERFECTION OF THE LENDERS' LIENS

Webster is not bound by the debtor's stipulations in the
Interim Order to the validity and perfection of the Lenders'
liens and security interests.  The general rule is that a chapter
7 trustee is bound by the stipulations made by the debtor in
possession before the case was converted from chapter 11 to
chapter 7.  This includes stipulations as to the validity and
perfection of liens asserted by a secured lender in exchange for
the permission to use the lender's cash collateral.  See
Armstrong v. Norwest Bank, 964 F.2d 797 (8th Cir. 1992).

Here, however, the debtor's stipulations were expressly
subject to a procedure whereby parties could object to the

21

validity or perfection of the Lenders liens and security
interests.  Under decretal paragraph 18 of the Interim Order,
parties had until "the later of the date this Order becomes a
Final Order or sixty (60) days from the date this Order is
entered" to file a proceeding contesting the Lenders' liens and
security interests.  No final order was entered, and thus the
time to object to the stipulation has yet to even commence.  This
specific provision was plainly intended to trump any stipulation
by the debtor as to the validity and perfection of the Lenders'
liens and security interests.  Although Webster failed to file a
proceeding to contest the perfection of the Lenders' liens prior
to the commencement of this adversary proceeding, that failure
does not bar his contesting the perfection of the liens as a
defense in this adversary proceeding.  The Interim Order plainly
allowed for the lack of perfection of a prepetition lien of the
Lenders to be asserted as a defense to any contention by the
Lenders that they were entitled to a replacement lien with
respect to such prepetition lien.

The footnote to the Interim Order indicated that a
replacement lien would arise under the terms of the Interim Order
only to the extent that the Lenders' prepetition liens were valid
and perfected, and the later stipulation with Teng filed on

October 31, 2000, made this clear.[11]  By so providing, the
Interim Order reserved to Webster, in defending against the
Lenders' claim that they have a replacement lien on the proceeds
of the preference actions, the right to challenge the perfection
of the Lenders' liens and security interests they claim to have
held on the debtor's deposit accounts.

Nortel contends that Webster's failure to object to the
Lenders' proof of claim must result in treating the claims as
secured by perfected liens as asserted in the proof of claim.
See 11 U.S.C. § 502(a).  There was, however, no bar date for
objecting to a proof of claim, and, in effect, Webster has
objected to the proof of claim in defending this adversary
proceeding.  Moreover, although Webster may be time-barred by 11
U.S.C. § 546(a) from attempting affirmatively to avoid the
Lenders' liens under 11 U.S.C. § 544(a), he still is entitled to
assert his rights as a hypothetical judgment lien creditor under
§ 544(a) defensively to the Lenders' assertion in their proof of
claim that they held perfected liens.  See, e.g., Lassman v.
Poulos (In re American Pie, Inc.), 361 B.R. 318 (Bankr. D. Mass.

---

[11]   The footnote used the word "or" when obviously the word
"and" was intended, otherwise the footnote would not have
accomplished anything.  Moreover, there was a procedure for
filing objections to whether the Lenders' liens were perfected,
and such objections would be an empty gesture if perfection were
not a prerequisite to the liens being entitled to adequate
protection.  The stipulation with Teng removes any doubt that
"and" was the intended meaning of the word "or" in the footnote.

2007).

In any event, the Lenders' proof of claim is as of the petition date, and does not fix the Lenders' entitlement to a replacement lien, the issue presented here. Webster may contest whether the Lenders are entitled to a replacement lien pursuant to the Interim Order which plainly provided that if the liens were not perfected, the Lenders were not entitled to a replacement lien.

VI

THE LENDERS HAVE NOT ESTABLISHED THAT THE COLLECTIONS DURING
THE CHAPTER 11 PERIOD WERE PROCEEDS OF THEIR CASH COLLATERAL

The Lenders urge that they are entitled to a replacement lien for any depletion of $2,237,713.90 in deposits that were made into the Lockbox Account during the Chapter 11 Period, contending that all of the deposits made into the debtor's accounts during the Chapter 11 Period were proceeds of the Lenders' cash collateral. On this record, the Lenders are not entitled to prevail on that argument.

A.

The Lenders' prepetition lien in the debtor's collateral extended to "any identifiable proceeds of [that] collateral." D.C. Code § 28:9-315(a)(2) (2001), and under the terms of the cash collateral order, the Lenders were entitled to a replacement lien as to any such proceeds that were used and not replenished by the debtor during the Chapter 11 Period. Under District of

24

Columbia law, however, proceeds other than goods that are commingled with other property are identifiable proceeds only "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this article with respect to commingled property of the type involved."  D.C. Code § 28:9-315(b)(2).

There is a genuine issue of material fact concerning whether deposits made into the debtor's accounts during the Chapter 11 Period constituted proceeds of the Lenders' cash collateral.  The parties agree that, based upon the records available to Webster, it is not possible to directly link individual deposits made into the debtor's accounts during the Chapter 11 Period to a particular customer or to a specific invoice that would reflect the date the related services were rendered.  Webster contends that this lack of evidence is fatal to the Lenders' assertion of a $2.5 million replacement lien in the Preference Action Proceeds because without such information, the Lenders are unable to distinguish between proceeds of the debtor's prepetition collateral and proceeds of the debtor's postpetition collateral.

Although the trustee has not submitted any probative documentary evidence concerning whether the deposits in question were made on account of prepetition or postpetition services, it is undisputed that the debtor did, in fact, continue to operate

during the Chapter 11 Period, and it is likewise undisputed that the debtor provided services during that period for which it would have been entitled to compensation.  Likewise, the parties agree that no separate account was established to segregate funds that constituted the Lenders' cash collateral from postpetition assets of the debtor.

Nortel contends that the debtor's receipts during the Chapter 11 Period could not have arisen from accounts receivable for postpetition services.  There was simply too little time in the Chapter 11 Period, it contends, for the debtor to render services to a customer, generate and send an invoice, and receive payment.  In support of this assertion, Nortel submitted with its reply to Webster's opposition to Nortel's motion for summary judgment an Aging History Report, allegedly filed by Webster in the bankruptcy case, which lists accounts as delinquent when they were due for more than 30 days, a span of time longer than the Chapter 11 Period.[12]  Webster denies that he submitted the Aging History Report.  Moreover, that the debtor's terms may have

---

[12]   Including Thursday September 28, 2000, the beginning day of the case (when the petition was filed) and Monday October 23, 2000, the day on which the court entered its order converting the case to chapter 7, the case was pending in chapter 11 for 25 days.  Nortel contends that the last business day of the Chapter 11 Period was October 20, 2000, and that, accordingly, the debtor operated as a business during the Chapter 11 Period for only three weeks and one day.  Whether the period during which the debtor operated its business is viewed as 22 days or 25 days does not alter the court's analysis.

required payment within 30 days does not establish that the debtor never received payment in less than 30 days.

On the current record, and based upon the debtor's continued postpetition business operations and the lack of segregated accounts, Nortel has failed to negate that at least some of the deposits made into the debtor's deposit accounts during the Chapter 11 Period were made on account of postpetition services and thus did not constitute the Lenders' cash collateral. When viewing the evidence in the light most favorable to Webster and for purposes of disposing of this motion, the court must therefore assume that the debtor's accounts were commingled such that the principles of tracing apply.

The Lenders have presented no affidavits or deposition testimony regarding the debtor's historical timing of the receipt of account receivable payments, the level of work it was performing during the Chapter 11 Period versus its recent level of prepetition work, and the debtor's billing practices during the Chapter 11 Period. Nor have the parties addressed whether, as a matter of law, that would furnish a basis for estimating what portion of the debtor's accounts receivable collections made during the Chapter 11 Period were of accounts receivable that existed on the petition date, and whether that type of estimate would be a task for the factfinder at trial, not for disposition via summary judgment.

27

B.

Nevertheless, Nortel may be entitled to shift the tracing
burden to Webster, but the parties failed to address the law
concerning this issue.  Moreover, the shifting of the tracing
burden was suggested as an issue only in Nortel's reply to
Webster's opposition, not as part of the motion itself, with the
result that Nortel has not followed the procedure of LBR 7056-1
regarding filing a separate statement, as part of the motion, of
the alleged facts allegedly not in material dispute.  The court
will thus decline to grant partial summary judgment in Nortel's
favor in this regard, but the court will set forth its
preliminary thoughts regarding this issue.

Ordinarily, it is the secured creditor's burden to trace its
cash collateral if that cash collateral was commingled with other
funds.  In re Qmect, Inc., 2006 WL 2038041 *4 (Bankr. N.D. Cal,
June 27, 2006).  See also D.C. Code § 28:9-315(b)(2) (proceeds
that are commingled with other property are identifiable "to the
extent that the secured party identifies the proceeds by a method
of tracing . . . .").  In some instances, however, equitable
considerations may justify a shifting of the burden of proof,
especially where the debtor's prior "breach of duty . . . created
the confusion preventing proof of the issue."  Freightliner
Market Dev. Corp. v. Silver Wheel Freightlines, Inc., 823 F.2d
362 (9th Cir. 1987), citing United States v. Hayes, 369 F.2d 671,

28

676 (9th Cir. 1966).  The Lenders bear the burden of proving that the tracing burden should shift to Webster.

The Lenders urge that burden shifting is appropriate in these proceedings because the absence of records that would otherwise allow the parties to trace the deposits to the Lenders' prepetition collateral is attributable to either the debtor's or the trustee's failure to preserve records pursuant to their respective statutory duties to account for property of the estate and such failure cannot be held against Nortel and the Lenders. Webster responds that burden shifting is inappropriate in the instant case because it is the Lenders who failed to take appropriate measures to ensure that the debtor in possession segregated the Lenders' cash collateral from other debtor assets.

The Lenders conditioned the debtor's use of their prepetition cash collateral on the terms of the Interim Order which required the debtor to deposit all cash and cash equivalents into a blocked collection account or accounts (the "Cash Collateral Account"), and limited the disbursements from that account to those specified in the Interim Order.  The Interim Order was not a model of clarity regarding whether collections of accounts receivable arising from postpetition work were to be segregated from the Lenders' cash collateral.  The requirement to deposit all cash and cash equivalents into the Cash Collateral Account did not clearly distinguish between cash

29

obtained from prepetition versus postpetition accounts receivable
(the latter being a category upon which the Lenders would have a
replacement lien for any depletion of prepetition accounts
receivable).  Moreover, the Interim Order provided at decretal
paragraph 24 for Nortel to have access to the debtor's books and
records, including invoices, and any and all other books and
records pertaining to the debtor's use of the Lenders' cash
collateral.  At decretal paragraph 23, the Interim Order provided
for weekly cash flow reports which were to conform to the form of
the Interim Order's budget for use of cash collateral.  That
budget extended to December 2000, and made no attempt in listing
revenues to distinguish between proceeds of prepetition accounts
receivable and postpetition accounts receivable.  This suggests
that the Lenders were not looking to have the cash collateral
proceeds segregated.

Under 11 U.S.C. § 363(c)(4) a trustee (or debtor in
possession exercising the powers of a trustee under § 1107)
"shall segregate and account for any cash collateral in the
trustee's possession, custody, or control," but the parties were
free to provide in an agreed cash collateral order that
prepetition and postpetition accounts could be deposited into the
same account.  Nortel might have argued, but did not argue, that
it never consented to the debtor's not segregating its cash
collateral, that is, that the Interim Order does not expressly

purport to relieve the debtor of that obligation.[13]  However, the
court in In re Qmect, Inc., 2006 WL 2038041 at *5, viewed a cash
collateral order that did not include a provision for segregation
of cash collateral as relieving the debtor in possession of the
obligation to segregate, and the ambiguous provisions of the
Interim Order here could be viewed the same way.

Webster contends that it was the Lenders who decided to
forego the cost of his maintaining software through which the
nature of the work (prepetition or postpetition) giving rise to
the accounts receivable being collected postpetition could be
ascertained.[14]  If the debtor had an obligation to segregate cash
collateral (but the existence of that obligation was clouded by
the ambiguous terms of the Interim Order), the Lenders' decision
to forego maintaining software that would enable tracing of cash
collateral may affect the propriety of shifting the burden to
Webster to trace the postpetition collections that were not the

---

[13]  Indeed, in responding to Webster's argument that Nortel
was obligated to cause the debtor to segregate cash collateral
Nortel contends in its reply memorandum that the debtor had no
duty to segregate cash collateral.  Reply Memorandum at p. 15.
Because Nortel was responding to an argument that it had the duty
to make the debtor segregate cash collateral, and because a party
might not be bound by an erroneous statement of the law, Nortel
might not be bound by its concession that there was no duty to
segregate if, indeed, the debtor still had a duty to segregate
cash collateral.

[14]  It is not clear that Webster has presented affidavits or
deposition testimony of an admissible character to support his
contention.

Lenders' cash collateral.  The Lenders, however, might be able to
respond that had the debtor segregated cash collateral, it would
not be necessary to have records in order to engage in tracing.

Whether the burden to trace should be shifted to Webster
based upon the failure of the debtor and Webster to keep adequate
records and segregate the debtor's funds might ultimately be a
mixed question of fact and law, requiring the court to weigh
conflicting evidence, a task reserved for the finder of fact at
trial.  Without the parties having really focused on the legal
issues and presented the facts under the procedures of LBR 7056-
1, the court will decline to grant Nortel partial summary
judgment on this issue.

VII

THE LENDERS HAVE NOT ESTABLISHED
THAT THEY HAD PERFECTED LIENS ON THE DEPOSIT ACCOUNTS

There plainly was a depletion of the debtor's deposit
accounts (a form of cash collateral) by the end of the Chapter 11
Period, and the Lenders contend they are entitled to recover the
amount of that depletion from the Preference Action Recoveries.
There is no dispute that the value of the replacement lien is
limited to the amount by which the Lenders' cash collateral was
depleted, and not replaced by postpetition assets, during the
Chapter 11 Period.  There is likewise no genuine dispute that the
cash balances of the debtor's deposit accounts decreased by a net
amount of $355,858.93 between the petition date and the

conversion date (the difference between the $1,973,344.26

petition date figure and the $1,617,485.33 conversion date

figure).[15]   The Lenders thus contend that they are entitled to

partial summary judgment with respect to that $355,858.93

diminishment of the deposit accounts.   Webster has, however,

challenged the validity and perfection of the Lenders' security

interest in the debtor's deposit accounts.

                              A.

      Nortel has failed to demonstrate that the Lenders had a

perfected security interest in funds held in the debtor's deposit

accounts on the petition date by demonstrating that those funds

are proceeds of collateral in which the Lenders had a properly

perfected security interest.   Nortel, for example, has not even

_____

      [15]  Webster has not contested the accuracy of the
$1,617,485.33 conversion date figure, but states that from the
debtor's bank accounts, as demonstrated by his expert's report, a
total of $1,865,476.96 was turned over to him, and thus contends
that any replacement lien should be no more than the amount of
$107,867.30 (the difference between $1,973,344.26 and
$1,865,476.96).   I reject Webster's calculation.   Webster's
expert did not calculate the amount of the deposit accounts on
the conversion date, but instead included amounts that were
deposited into the deposit accounts after the conversion date and
prior to the bank deposits being received by him on dates ranging
from 23 to 29 days after the conversion date.   Those additional
amounts, if the proceeds of prepetition accounts receivable,
would be independent items of cash collateral from those
deposited by the conversion date.   The point is that to calculate
the amount by which the deposit accounts had been depleted by the
conversion date, a snapshot of the amount of the deposit accounts
must be taken as of the conversion date, and it is improper to
use the amount of the deposit accounts at some later date that
includes deposits of independent cash collateral items.

replied to Webster's point that the Lenders made two infusions of
cash in July and August 2000 (the two months preceding the month
of the filing of the petition commencing the bankruptcy case) in
the sum total of $19 million in return for which they received
stock (an equity interest, not a debt).  To the extent that the
deposit accounts on the petition date derived from that $19
million, the deposit accounts are not proceeds of accounts
receivable securing the debts owed the Lenders.

                                    B.

     That the Lenders' security agreements with the debtor may
have included deposit accounts as collateral would not have
sufficed to give them a perfected security interest in the
deposit accounts.  As trustee, Webster enjoys under 11 U.S.C. §
544(a) the powers of a judgment lien creditor as of the petition
date.  Accordingly, his priority against the Lenders was fixed as
of 2000, and the 2001 revisions to Article 9 of the Uniform
Commercial Code do not govern his priority against the Lenders.
See  Business Bank v. White (In re Timothy Dean Restaurant &
Bar), 342 B.R. 1, 10 n.10 (Bankr. D.D.C. 2006).  As noted in
Timothy Dean Restaurant, 342 B.R. at 14 (footnote omitted):

          Under the *prior* version of Article 9, . . . security
          interests in deposit accounts as *original* collateral do
          not fall within the scope of Article 9.  See Va. Code §
          8.9-104(1) (repealed 2001) [a provision identical in
          all material respects to the D.C. Code's counterpart].
          In other words, the former Article 9 only governed
          transactions creating a security interest in a deposit
          account if the property in the deposit account was the

                                    34

proceeds of collateral in which the secured party had
an Article 9 security interest. [Citations omitted.]
Consequently, the Bank cannot assert a security
interest-perfected or unperfected-under the former UCC.
. . .

Prior to the 2001 amendment to Article 9, the only
means of obtaining a security interest in a deposit
account that was not the proceeds of secured collateral
was through the common law, chiefly through the
mechanism of the pledge.  "[A] pledge is a transfer of
property as security for a debt."  Nat'l City Bank v.
Toffel ( In re Ala. Land & Mineral Corp.), 292 F.3d
1319, 1325 (11th Cir. 2002).  The creditor's interest
in the pledge is created "by a bailment to secure
payment of a debt or performance of a service."  All
American Auto Salvage v. Camp's Auto Wreckers, 146 N.J.
15, 679 A.2d 627, 630 (1996); accord Koch v. Han-Shire
Investments, Inc., 273 Minn. 155, 140 N.W.2d 55, 62
(1966); Duncan Box & Lumber Co. v. Applied Energies,
Inc., 165 W.Va. 473, 270 S.E.2d 140, 143-44 (1980).
According to the Supreme Court, there are three
elements necessary to create a pledge: (1) a debt; (2)
an offer of property to secure that debt; and (3)
transfer of that property from the debtor to the
creditor.  Mechanics' & Traders' Ins. Co. v. Kiger, 103
U.S. 352, 356, 26 L.Ed. 433 (1880).

Because the Lenders have not established that they had dominion

and control over the deposit accounts, they have not established

that they had a lien on deposit accounts as original

collateral.[16]

---

[16]  As revised in 2001, the UCC requires a secured party to
have control of a deposit account in order to have a perfected
security interest in the deposit account as original collateral.
See D.C. Code § 28:9-314(a) and (b).  Even if the revised version
of the UCC were to apply here, the record on the pending motion
does not establish that Nortel had control of the deposit
accounts in the manner provided by D.C. Code § 28:9-104.

VIII

CONCLUSION

For all of these reasons, it is

ORDERED that Nortel's motion for partial summary judgment is
DENIED.  It is further

ORDERED that the parties appear for a status conference on
May 13, 2008, at 9:30 a.m.

[Signed and dated above.]


Copies to:

All counsel of record; Office of the United States Trustee.